[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11280

_____

JACKSON NATIONAL LIFE INSURANCE COMPANY,

Plaintiff-Counter Defendant,
Appellee,

*versus*

STERLING CRUM,

Defendant-Counter Claimant,
Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-03857-WMR

_____

Before BRANCH, GRANT, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

This case presents an issue of first impression regarding what constitutes an illegal wagering contract under Georgia insurance law. Plaintiff Jackson National Life Insurance Company issued a $500,000 life insurance policy to Kelly Couch after the latter falsely represented that he was not HIV positive. At the time, during the 1990s, HIV-positive individuals had a greatly diminished life expectancy, which led to high demand for HIV-positive insureds willing to engage in viatical settlements.[1] Indeed, it seems clear that Couch obtained the policy for the sole purpose of selling it to a third-party buyer and pocketing the purchase price.

Had Couch entered into a purchase agreement with a buyer at the time he applied for the policy, the policy clearly would have been void as an illegal wagering contract. He did not do that, however. Instead, at some undetermined point before or after procurement of the policy, Couch began working with an intermediary—a brokerage agency specializing in viatical settlements—to find a buyer for his policy. Within eight months of the issuance of the policy, the agency found a willing purchaser in defendant Sterling

---

[1] A viatical settlement is an arrangement whereby a person, usually with a terminal illness, sells a life insurance policy to a third party for less than its mature value in order to obtain funds that the insured can use while alive.

Crum.  The premiums were paid through a premium reserve fund set up by the broker until after the two-year contestability period for the policy expired in 2001.[2]  At that point, Defendant began directly paying the policy premiums and he continued on for eight more years, finally letting the policy lapse in 2009.

As it turned out, Couch had died in 2005, at a time when Defendant was still making payments on the policy.  Eleven years later, in 2016, Defendant became aware that Couch had died.  He then made a claim for the death benefit under Couch's policy.  Declining payment of any death benefit to Defendant, Plaintiff filed this declaratory judgment action seeking a declaration that, under Georgia law, the policy was void *ab initio* as an illegal human life wagering contract and further that Defendant's claim was barred by laches, given the eleven-year delay in making the claim.

The district court conducted a bench trial and found that Couch took out the policy on his own life with the intent to sell the policy in the near future to one without an insurable interest.  Accordingly, the court concluded that the insurance policy was void and unenforceable as an illegal human life wagering contract under Georgia law.[3]  Defendant appeals, arguing that Couch's unilateral

---

[2]  Under Georgia law, a life insurance company has two years to uncover any fraudulent representations made by the insured.  After that point, the company can no longer invalidate the policy based on the insured's false representations.

[3]  The parties agree that Georgia law governs.

intent to sell the policy is insufficient to declare the policy void *ab initio*. Rather, Defendant contends, Georgia law also requires the knowing and direct involvement of an identified third-party beneficiary at the time of the initial procurement of the policy before one can characterize the policy as an illegal human life wagering contract.

Thus, the question before this Court is whether a life insurance policy is void *ab initio* if it is procured by an individual on his own life for the sole purpose of selling the policy to a third party without an insurable interest in the insured, but without the complicity of the ultimate purchaser at the time of procurement. Georgia caselaw does not definitively answer this question. Accordingly, certification to the Georgia Supreme Court is warranted pursuant to O.C.G.A. § 15-2-9(a).

## I.     BACKGROUND

### A.     Factual Background

In August 1998, Kelly Couch applied for a term life insurance policy with a $500,000 death benefit from Plaintiff. It is undisputed that Couch made several material misrepresentations in his application for the policy: (1) he used an incorrect Social Security number, (2) he failed to disclose that he had filed for bankruptcy twice in the past seven years, and (3) he represented that he was a healthy 32-year old man, when in fact he was HIV-positive. That Couch would seek such a large life insurance policy, absent any dependents who relied on his income, seems odd. Even odder is the fact

that Couch, who had a troubled financial history involving two bankruptcy filings in seven years, would expend much needed cash on a life insurance policy for which there was no identified beneficiary.[4]

The answer to the "why" motivating Couch was the AIDS crisis, which, having begun in the 1980s, gave rise to a flourishing viatical settlement industry selling life insurance policies held by HIV-positive individuals.  At first, most of these policies were clearly legitimate, as they typically involved an HIV-positive insured individual selling for a lump sum to a third party a policy he had acquired without fraudulent representations at a time when he was healthy.  The third party could purchase for a fraction of its value a life insurance policy on a person whose life expectancy was quite short; the insured, dying of what was then a terminal and quick-acting disease, would then gain some needed cash in his final months.  Eventually, however, the demand by viatical investors for HIV-positive insureds outstripped the supply of policies purchased non-fraudulently when an insured was healthy.  Nevertheless, the ability to purchase for a fraction of its value a life insurance policy on a person likely to soon die remained too tempting a proposition to lie untapped by potential investors.  Thus, some HIV-positive individuals began working with insurance brokers to market life insurance policies that the former had fraudulently procured <u>after</u> having received an HIV diagnosis.  One scheme to effect this plan

---

[4] Couch listed his estate as his beneficiary.

was "clean sheeting," which involved the use of an imposter's clean blood sample on behalf of an HIV-positive insurance applicant and which thereby enabled the applicant to fraudulently obtain a life insurance policy that could then be sold to a third party for profit.

Couch had received two HIV-positive blood tests in the weeks surrounding his application for life insurance in 1998.[5] At that time, his life expectancy was 24-30 months, meaning that Plaintiff obviously would not have approved Couch's application for a $500,000 life insurance policy had it known about his HIV-positive status. Not surprisingly, Couch omitted any information about his HIV diagnosis on his life insurance application and, presumably by some fraudulent means, he provided a blood sample from an individual without HIV to Plaintiff during his application process.

Unaware of Couch's HIV-positive status or his bankruptcy filings, Plaintiff approved Couch's application. After processing Couch's application fee and an initial premium payment, both of which Couch paid using a check from his own bank account, Plaintiff issued the policy at issue in this litigation in January 1999. The policy listed "Kelly Couch" as the insured, and it named Couch's estate as the beneficiary. As required by Georgia law, the policy contained an incontestability clause stating:

---

[5] Moreover, prior to purchasing Couch's policy, defendant Crum was provided with a form from his broker indicating that Couch had been diagnosed with HIV as early as 1996.

During but not after the contestable period, [Plaintiff] can contest the validity of this policy or deny a claim for any misrepresentation or nondisclosure of a material fact in the application.  The contestable period starts when the policy goes into force and ends when the policy has been in force during the insured's lifetime for 2 years from the policy date.

There is no documentary evidence establishing exactly when Couch began working with Associates Trust, which was a viatical insurance broker that procured and sold insurance policies on the lives of HIV-positive insureds.  That is, whether or not Couch and the broker's interactions began before Couch attempted to procure the policy is unknown.  We do know that within a few months after issuance of the policy to Couch in January 1999, Associates Trust was working with Couch to sell the policy.  Specifically, by August 1999, Associates Trust was attempting to market the policy to the defendant in this case, Sterling Crump.  At that time, defendant Crump, an experienced investor in the viatical settlement industry, was involved in a dispute with Associates Trust over a viatical policy he had purchased in 1998 that had turned out to be invalid.  Instead of refunding Defendant's money, Associates Trust offered to transfer the Couch policy to Defendant.

Before deciding whether to agree to this transfer, Defendant received a one-page summary from Associates Trust, which indicated that Couch had tested positive for HIV in 1996, that he had been issued the policy in question in January 1999, and that a recent

doctor's review confirmed a life expectancy of only 24-30 months. Defendant accepted the agency's offer to transfer the Couch policy to him and a Beneficiary/Ownership Change Form was submitted to Plaintiff in September 1999. In that Form, Couch requested that Plaintiff change the primary beneficiary of the policy from his estate to his "Friend" Sterling Crum, a characterization that was clearly untrue, as Couch had never met or spoken to Defendant. Indeed, as noted above, Defendant did not become aware of Couch's death until eleven years after the latter's demise.

Plaintiff approved the change-of-beneficiary request on September 22, 1999. Thereafter, Associates Trust arranged for premium payments to be made through a "premium reserve account," which made it appear the payments were still coming directly from Couch.[6] This arrangement continued until the insurance company's two-year contestability period ended in January 2001, after which time Defendant began making all premium payments. Defendant continued making these premium payments for the next eight years, through 2009. Plaintiff never contested the policy while it was in force.

Couch died on June 10, 2005. At that time, all policy premium payments had been made and Defendant was the named beneficiary. Because he was unaware of Couch's death, however, Defendant made no claim on the policy. Instead, Defendant continued making premium payments on the policy for nearly four years after

---

[6] The annual premium was $250 per year.

Couch's death, until January 2009.  Defendant then stopped making premium payments and let the policy lapse.

In late 2016, Defendant learned that Couch had died eleven years earlier, at a time before the policy lapsed.  Defendant submitted a claim to Plaintiff for the death benefit under the policy in January 2017.  Plaintiff refused to pay Defendant's claim.

### B.    Procedural History

After denying Defendant's claim, Plaintiff filed this action seeking a declaratory judgment that the policy was void *ab initio* and unenforceable as an illegal human life wagering contract and for lack of an insurable interest.  Defendant responded with a counterclaim seeking a declaration that the policy is valid and enforceable and that he is entitled to the $500,000 death benefit, plus interest, in accordance with Georgia law and the terms of the policy.  Following discovery, both parties moved for summary judgment.  The district court denied both motions and the case proceeded to a bench trial.

After the trial, the district court issued written findings of fact and conclusions of law.  As relevant here, the court found that Couch had procured the policy on his own and that Defendant had not caused Couch to apply and pay for the policy nor was Defendant otherwise involved at the policy's inception.  Nevertheless, the court held that the policy was an illegal wagering contract because Couch procured the policy with the intent to sell it.  In support of its conclusion that at the time he took out the policy, Couch was

looking to offload the policy and obtain immediate cash, the court noted that: (1) Couch was an HIV-positive self-employed house cleaner making $85,000 annually, who had filed for bankruptcy twice during the preceding seven years, (2) he misrepresented his financial status and medical history during the application process, (3) he was unmarried and had no dependents when he applied for the policy, and (4) he quickly (within eight months) sold the policy after its inception. Based on this evidence, but again despite the absence of evidence indicating third-party involvement at the inception of the policy, the district court held that the policy was void *ab initio* and unenforceable as an illegal wagering contract because of Couch's unilateral intent to sell it for profit. Having found the policy void, the district court declined to address Plaintiff's laches argument.

## II.    STANDARD OF REVIEW

On appeal from a judgment in a bench trial, we review the district court's conclusions of law de novo. *U.S. Commodity Futures Trading Comm'n v. S. Trust Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018). We also review de novo the district court's interpretation of Georgia law and its application of the law to the facts. *See id.* The district court's findings of fact, on the other hand, are evaluated under the clear-error standard. *Id.* "We will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *Id.* at 1322 (quotation marks omitted).

## III.    DISCUSSION

### A.    Parties' Contentions

Georgia caselaw provides that a life insurance policy deemed to constitute an illegal wagering contract is void *ab initio*. On appeal, defendant Crump argues that in holding that third-party involvement is not necessary to show an illegal wagering contract, the district court improperly interpreted Georgia insurance law. Specifically, Defendant argues, because Georgia law provided Couch an unlimited insurable interest in his own life, no life insurance that is "lawfully taken out" at its outset can ever constitute an illegal wagering contract. *See* O.C.G.A. § 33-24-3(b). And, Defendant continues, Couch's policy was lawfully taken out at its inception because no third party intending to wager on Couch's life was involved in procuring that policy. Further, Georgia law permits an individual to subsequently sell a policy lawfully obtained to someone who, like Defendant, does not have an insurable interest in the insured's life. Thus, Defendant concludes, Couch's unilateral intent at the time of the policy's issuance to later sell that policy for profit to someone having no insurable interest is insufficient to deem the policy an illegal wagering contract void at issuance. Stated another way, absent an agreement at the time of issuance of a life insurance policy by an identified person to later purchase the policy, the policy cannot be characterized as an illegal wagering contract.

Plaintiff responds that Georgia case law establishes that a policy is an illegal human life wager when an insured takes out that policy on his own life with the intent to enter into a wagering

contract, regardless of whether a wagering third party was directly involved in procuring the policy. Plaintiff argues that Georgia law does not allow an insured to take out a life insurance policy on his or her own life when the insured's sole intent is to sell that policy to a third party who is gambling on the insured's quick demise. Plaintiff emphasizes that Georgia courts have long held that the validity of a policy intended to benefit a person with no insurable interest requires the insured to have acted for himself, at his own expense, and in good faith to promote the interest of that beneficiary. Plaintiff contends that, when interpreted properly, Georgia law precludes enforcement of a policy procured by the insured with an intent to sell it for profit to a third party who does not have an insurable interest. According to Plaintiff, that the insured has manipulated the sequence of events to assure that the identity of that third party will not be known at the time the policy is procured should not render valid a policy that would have been invalid had the purchaser been earlier identified.

B.    Georgia Caselaw Impacting the Question Whether Couch's Life Insurance Policy is Void *Ab Initio* as an Illegal Wagering Contract

The question here is whether an illegal human life wagering contract exists when a life insurance policy obtained by an individual on his own life is procured with the intent to sell the policy to an as-yet unidentified third party and when the policy is in fact later sold to such a third party—even if no third party was involved at

20-11280               Opinion of the Court                 13

the time the policy was procured.  The district court determined that *Clements v. Terrell*, 145 S.E. 78 (Ga. 1928) controlled the resolution of this question.  Specifically, the court relied on *Clements'* statement in dictum that an insured has the ability to name any beneficiary he chooses for a life insurance policy only so long as the insured has no intent to enter into a wagering contract.  *Clements*, 145 S.E. at 79.  Given this statement, the district court concluded that because the evidence demonstrated Couch's intent to enter into a wagering contract at the time he procured the policy, it did not matter that the eventual third-party purchaser had not been involved in the actual procurement of the policy.  Couch's intent rendered the policy an unlawful wagering contract, and thus void *ab initio*.

The dictum in *Clements* notwithstanding,[7] there is no Georgia case authority that definitively addresses the present question.  And much of the Georgia caselaw that pertains to the general subject matter surrounding this issue is many decades old.  Nevertheless, an examination of that caselaw reveals a few foundational principles.

---

[7] The case on whose dictum the district court relied—*Clements*—did not focus on the question whether the life insurance policy was a wagering contract.  Instead, the question arising in *Clements* was twofold:  whether a beneficiary who was named and described as the insured's wife could collect on the policy when it turned out that she and the decedent were never legally married and whether the estate, as opposed to the insurance company, could make this challenge.  *Clements*, 145 S.E. at 80–83.

14                    Opinion of the Court                    20-11280

First, a person lacking an "insurable interest"[8] in the insured cannot unilaterally take out a life insurance policy on the insured, naming himself as a beneficiary, without the insured's knowledge or consent. *See Wood v. New York Life Ins. Co.*, 336 S.E.2d 806, 808–09 (1985). As *Wood* gently put it, a beneficiary who has no interest in the insured's life might be tempted to "hasten by improper means the time when he will receive the benefits of the policy." *See id.* at 809. Indeed, Georgia has codified the public policy interest in forbidding such contracts, with its insurance statute providing: "Any personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i).

That statutory prohibition is not triggered here because all agree that Couch procured the policy on his own life without any assistance or prodding from Defendant. Further, the district court found insufficient proof that a third party, such as Associates Trust, was involved in Couch's decision to obtain the policy. Yet, while a

---

[8] The Georgia insurance statute defines an "insurable interest" as "an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of another person and consequent loss by reason of such person's death or disability or a substantial interest engendered by love and affection in the case of individuals closely related by blood or by law." O.C.G.A. § 33-24-3(a). For example, a business partner, spouse, or child would likely be deemed to have an insurable interest in the insured.

stranger cannot take out a life insurance policy on the insured, the insured is not so limited and, as a general matter, has the right to name any beneficiary he chooses for a policy that the insured has himself procured. Specifically, Georgia law makes clear that "[a]n individual has an unlimited insurable interest in his or her own life . . . and may lawfully take out a policy of insurance on his or her own life . . . and have the policy made payable to whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest." O.C.G.A. § 33-24-3(b) (emphasis added). This statute codifies long-standing Georgia case law. *See Union Fraternal League v. Walton*, 34 S.E. 317 (Ga. 1899) (explaining that a valid contract of insurance cannot lawfully be taken on the life of another by one who has no insurable interest therein because it contravenes public policy, but that one having an insurable interest in his own life may lawfully procure insurance thereon for the benefit of any other person whose interest he desires to promote).

But Georgia caselaw has also established an exception to the general rule allowing the insured to name whomever he wants as a beneficiary. That exception prohibits an individual from taking out a policy on his or her own life as part of a wagering contract. "The true rule . . . is that one may insure his life, and make the amount of the policy payable to whom he pleases, provided the contract is not made at the expense and for the benefit of the person designated as the beneficiary, as a cover for a mere wagering contract." *Walton*, 34 S.E. 317 at 320. In fact, Georgia statutory law deems wagering contracts unenforceable as contrary to public

policy.  O.C.G.A. § 13-8-2(a)(4).[9]  Such policies are therefore void *ab initio*, as if the contract never existed.  *Wilson v. Progressive Life Ins. Co.*, 7 S.E.2d 44, 44–45 (Ga. Ct. App. 1940).

Thus, despite an individual having an unlimited insurable interest in his own life pursuant to O.C.G.A. § 33-24-3(b), a policy procured by the putative insured on his own life for the benefit of one with no insurable interest can be assessed to determine whether the policy should be deemed void as a "wagering policy" or because it was assigned "by way of cover for a wager policy." *See Walton*, 34 S.E. at 321; *Rylander v. Allen*, 125 Ga. 206, 53 S.E. 1032, 1034 (Ga. 1906); O.C.G.A. § 33-24-3(k).

No Georgia case provides guidance on the question whether an illegal wagering contract exists when a terminally-ill insured has purchased a life insurance policy with the expectation that he will soon sell that policy to a speculator, but has purposely manipulated the timing of that sale to dodge any characterization of the transaction as being illegal.  Specifically, here an insured diagnosed with a terminal illness procured a life insurance policy solely for the purpose of selling the policy for a profit—but he did so without, at least as far as the evidence shows, the immediate involvement of a third party.  Within months of that procurement, and through the

---

[9]  Section 13-8-2(a) provides that "[a] contract that is against the policy of the law cannot be enforced."  O.C.G.A. § 13-8-2(a).  The statute provides a non-exclusive list of examples of such contracts, and it includes "[w]agering contracts."  *Id.* at § 13-8-2(a)(4).

auspices of a brokerage agency that matched sellers of life insurance policies with purchasers, the insured succeeded in selling the policy to a buyer. The policy was then assigned to the latter who was named the beneficiary and who then paid future premiums. Because Georgia caselaw concerning illegal life wagering contracts does not address the legal standard governing such facts, we find it necessary to certify this question to the Georgia Supreme Court, as set out below.

## IV.    Questions to be Certified to the Georgia Supreme Court

Georgia law permits federal courts to certify questions of law to the Georgia Supreme Court when "there are no clear controlling precedents," as to a question of law that is "determinative of the case"; the Georgia Supreme Court is authorized to answer such questions by written opinion. O.C.G.A. § 15-2-9(a). "Under our precedent, 'we should certify questions to the state supreme court when we have substantial doubt regarding the status of state law.'" *Whiteside v. GEICO Indem. Co.*, 977 F.3d 1014, 1018 (11th Cir. 2020), quoting *Peoples Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337, 1340 (11th Cir. 2019) (quotation marks omitted)). "Certifying questions is a useful tool 'to avoid making unnecessary *Erie* 'guesses' and to offer the state court the opportunity to interpret or change existing law.'" *Id.*, quoting *CSX Transp., Inc. v. City of Garden City*, 325 F.3d 1236, 1239 (11th Cir. 2003).

We assume the following facts in this case:

18                         Opinion of the Court                         20-11280

(1) An insured, diagnosed with a terminal illness that he failed to disclose, took out a policy on his own life for the purpose of selling the policy for profit to an individual whom the insured had not yet identified;

(2) At an undetermined date, but at least within a few months of purchasing the policy, the insured contacted a viatical brokerage firm to market the policy;

(3) The viatical firm marketed the policy, which was purchased during the two-year contestability period—and, specifically here, within eight months from the date of its issuance—by a buyer whom one could infer was on reasonable notice that the insured had likely procured the policy for the purpose of selling it to a person with no insurable interest in the insured.[10]

As to the controlling legal standard, we seek guidance on the question whether a third party with no insurable interest must be involved in the procurement of the policy before it can be deemed an unlawful wagering contract. Given the above nucleus of facts, our questions are these.

1.      When an insured has purchased a life insurance policy with the intent to sell the policy to a third party with no insurable

---

[10] Here, Defendant was aware that Couch had obtained a $500,000 policy after purportedly being diagnosed as HIV-positive and that he attempted to market his policy to a purchaser within a few months of its issuance.

interest, must either the subsequent purchaser or an intermediary[11] be complicit in the procurement of the policy before the latter can be deemed to be an illegal wagering contract and thus void *ab initio*?

2.    If the answer to the above question is neither an absolute "Yes" or "No," but instead is a response that a life insurance policy can sometimes be deemed to constitute an unlawful wagering contract even without the complicity of the described third party, then we respectively seek further guidance as to the circumstances that determine when the policy is void *ab initio* and when it is not.

In asking this question, "we do not intend to restrict the issues considered by the state court or to limit the state court's discretion in choosing how to frame or to answer these issues in the light of the facts of this case.'" *Whiteside*, 977 F.3d at 1022 (internal quotations omitted). "We ask broadly for the state court's help in getting the state law right in this case." *Id.* (internal quotations omitted).

---

[11] The Georgia Supreme Court's answer concerning an intermediary has relevance to both the question whether the insurance policy was void *ab initio* and to Plaintiff's laches defense, which defense the district court did not reach given its decision that the policy was void. Plaintiff's laches defense is based on Defendant's eleven-year delay in making his claim, which delay allegedly prejudiced Plaintiff's ability to show the precise timing and scope of any involvement by Associates Trust in Couch's procurement of the life insurance policy.

20                    Opinion of the Court                    20-11280

To assist in consideration of the certified question, the entire record and the briefs of the parties shall be transmitted to the Georgia Supreme Court. *Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1336–37 (11th Cir. 2015).

**QUESTION CERTIFIED**.