[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-11280

_____

JACKSON NATIONAL LIFE INSURANCE COMPANY,

Plaintiff-Counter Defendant,
Appellee,

versus

STERLING CRUM,

Defendant-Counter Claimant,
Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-03857-WMR

———————————

Before BRANCH, GRANT, and JULIE CARNES, Circuit Judges.

PER CURIAM:

In his appeal before this Court, defendant Sterling Crum argued that the district court erroneously held that a life insurance policy issued by plaintiff Jackson National Life Insurance Company ("Jackson") to third-party Kelly Couch, and subsequently sold by Couch to Crum, was void and unenforceable under Georgia law as an illegal human life wagering contract. Couch acquired the policy, which listed "Kelly Couch" as the insured and named Couch's estate as the beneficiary, in 1999. At the time, Couch was HIV-positive and he had a relatively short life expectancy. A few months after he purchased the policy, Couch, with the assistance of a viatical insurance broker, sold the policy to Crum and named Crum as its primary beneficiary.

Couch died in 2005. Several years later, when Crum learned about Couch's death, he made a claim for the death benefit under policy. Jackson declined to pay the benefit and initiated this action seeking a declaration that the policy was void *ab initio* under Georgia law as an illegal human life wagering contract. The district court conducted a bench trial and determined that Couch purchased the policy with the intent to sell it in the near future to an individual without an insurable interest in his life, but without the involvement or complicity of the ultimate purchaser (Crum) at the time of the purchase. Based on those facts and on its interpretation

of Georgia law, the district court concluded that the policy was void and unenforceable under Georgia law, and it entered judgment in favor of Jackson. Crum appealed, arguing that Couch's unilateral intent to sell the policy to a third party without an insurable interest in his life was insufficient to declare the policy void under Georgia law.

Resolution of Crum's argument required a determination of whether a life insurance policy is void under Georgia law as an illegal human life wagering contract if it is procured by an individual on his own life for the sole purpose of selling the policy to a third party without an insurable interest in the insured's life, but without the complicity of the ultimate purchaser at the time of procurement. Because Georgia law did not definitively resolve this issue, we certified the following question to the Georgia Supreme Court: "When an insured has purchased a life insurance policy with the intent to sell the policy to a third party with no insurable interest, must either the subsequent purchaser or an intermediary be complicit in the procurement of the policy before the latter can be deemed to be an illegal wagering contract and thus void *ab initio*?" *See Jackson Nat'l Life Ins. Co. v. Crum*, 25 F.4th 854, 863 (11th Cir. 2022).[1]

---

[1] We certified a second question requesting that the Georgia Supreme Court provide further guidance if its answer to the first question was not a definitive "yes" or "no," but it was unnecessary for the Georgia Supreme Court to consider the request, given that Court's response to the first question. *See Jackson Nat'l Life Ins. Co.*, 25 F.4th at 863.

The Georgia Supreme Court has now answered this Court's certified question, holding that "under Georgia law, a life-insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract." *Crum v. Jackson Nat'l Life Ins. Co.*, __So. 3d__, 2022 WL 14154472, at *1 (Ga. Oct. 25, 2022). With great appreciation to the Georgia Supreme Court for its assistance, we follow its decision and therefore reject Jackson's argument that the policy issued by Jackson on Couch's life—which policy Crum subsequently purchased and became named as its primary beneficiary—is void and unenforceable under Georgia law as an illegal human life wagering contract. The district court's ruling to the contrary is **REVERSED**.

After the Georgia Supreme Court issued its opinion, Jackson filed a motion to submit supplemental briefing to this Court. In its proposed supplemental brief, which Jackson attached to its motion, Jackson urged this Court to affirm the judgment entered in its favor below on the alternative ground of laches, given the long delay between Couch's death and Crum's submission of a claim for the death benefit under the policy. We **GRANT** Jackson's motion to submit supplemental briefing, and we have considered its proposed supplemental brief, as well as Crum's response to the brief.

We nevertheless reject Jackson's request that this Court decide whether Jackson's second ground for affirmance of the district court is meritorious. Given its conclusion that the insurance policy

at issue was void as an illegal wagering contract, the district court expressly declined to consider Jackson's laches argument. Because there is no ruling on the laches question from the district court, we decline to affirm the judgment entered in favor of Jackson on this alternative ground, or otherwise to consider the laches issue in this appeal. Instead, we **REVERSE and VACATE** the judgment entered by the district court in this case and **REMAND** the case for further proceedings consistent with this opinion, including a determination as to whether Crum's claim to benefits under the policy is barred by laches.

NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 25, 2022

S22Q0649.  CRUM v. JACKSON NATIONAL LIFE INSURANCE COMPANY.

PINSON, Justice.

This case comes to us from the United States Court of Appeals for the Eleventh Circuit, which has certified questions to us about Georgia life-insurance law. Those questions are set out below in full. The basic question we need to answer is whether a person can legally take out an insurance policy on his own life with the intent to turn around and sell that policy to a third party who has no "insurable interest" in the policyholder's life. The person seeking to recover on the life-insurance policy in this case says that such a policy is legal if a third party was not involved in causing the policy to be procured. The insurance company says that with or without such third-party involvement, such a policy is an illegal wagering

contract and therefore void, relying on some of our case law. But as it turns out, that case law was interpreting and applying old statutes. In 1960, our General Assembly repealed those statutes and replaced them with new statutory language that codified some, but not all, of the old decisional law. See OCGA § 33-24-3. And the new language, which remains materially the same today, does not even hint at the unilateral-intent-based limitation that the insurance company advances. So we answer the certified questions as follows: under Georgia law, a life-insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract.

1. *Background*

In 1999, Kelly Couch applied for a $500,000 life-insurance policy from Jackson National Life Insurance Company. When he applied, Couch told Jackson that he was healthy, but that was not true. In fact, Couch knew that he was HIV-positive, which, in 1999, meant that he had a greatly diminished life expectancy. He bought

2

the policy with the intent to sell it on the secondary "viatical settlement" market.[1] Eight months later, Couch did just that: a brokerage agency that specialized in viatical settlements connected Couch with Sterling Crum, who bought Couch's insurance policy knowing that Couch was HIV-positive and likely had only a few years left to live.

Couch died in 2005, and years later, Crum made a claim to Jackson for the death benefit under Couch's policy. Jackson denied the claim and filed a declaratory-judgment action in the U.S. District Court for the Northern District of Georgia, seeking a declaration that the policy was void ab initio under Georgia law as an illegal human-life wagering contract, and that laches barred

---

[1] A viatical settlement is an arrangement in which a person, usually with a terminal illness, sells a life insurance policy to a third party for less than its mature value to obtain funds that the insured can use while alive. Such settlements were common in the 1980s and 1990s for people who were HIV-positive. See *Jackson Natl. Life Ins. Co. v. Crum*, 25 F4th 854, 857 (11th Cir. 2022). Early on, many of these policies were legitimate, because the person had acquired the policy when healthy, without any fraud. See id. Later, as investor demand rose, some people who already had HIV worked with insurance brokers to market policies they procured fraudulently *after* having received an HIV diagnosis. See id.

3

Crum's claim.[2]

After a bench trial, the district court agreed with Jackson that the policy was an illegal wagering contract. The court found that Couch bought the policy without Crum's involvement, but with the intent to sell it in the near future to someone without an insurable interest. See *Jackson Natl. Life Ins. Co. v. Crum*, No. 1:17-cv-03587-WMR, 2020 WL 12968089, at *9 (N.D. Ga. Mar. 2, 2020). The court acknowledged that Georgia's statute addressing insurable interests in the context of life insurance did not appear to prohibit such a policy without the involvement of a third party at the time the policy was issued. Id. at *5, *7 (citing OCGA § 33-24-3 (b), (i)). But the court concluded that our case law treated such policies as illegal wagering contracts, see id. at *6–*7, and so it declared the policy void ab initio.

Crum appealed to the Eleventh Circuit. He contended that the district court erred in declaring the policy void ab initio based on

---

[2] It appears that Jackson could not deny Crum's claim based on any "misrepresentation or nondisclosure of a material fact" in Couch's application because the policy contained an incontestability clause that allowed denials on such grounds only for a period of two years from the date the policy went into force.

4

only Couch's unilateral intent to sell the policy soon after he bought it. In Crum's view, Georgia law requires "the knowing and direct involvement of an identified third-party beneficiary at the time of the initial procurement of the policy" to find a policy void ab initio as an illegal wager on a human life. *Jackson Natl. Life Ins. Co. v. Crum*, 25 F4th 854, 856–857 (11th Cir. 2022). The Eleventh Circuit, however, opined that Georgia case law did not definitively answer the question these arguments raised. So the Eleventh Circuit certified the following two questions to this Court:

> 1.   When an insured has purchased a life insurance policy with the intent to sell the policy to a third party with no insurable interest, must either the subsequent purchaser or an intermediary[] be complicit in the procurement of the policy before the latter can be deemed to be an illegal wagering contract and thus void *ab initio*?
>
> 2.   If the answer to the above question is neither an absolute "Yes" or "No," but instead is a response that a life insurance policy can sometimes be deemed to constitute an unlawful wagering contract even without the complicity of the described third party, then we respectively [sic] seek further guidance as to the circumstances that determine when the policy is void *ab initio* and when it is not.

Id. at 863 (footnote omitted).

5

## 2. *Analysis*

We address these certified questions in three steps. We start by explaining why these questions about whether a life-insurance policy is an illegal wagering contract are generally resolved by determining whether they meet the statutory insurable-interest requirement. Next, we review the statute that imposes that requirement, the language of which—and this is not disputed—does not prohibit buying insurance on one's own life with the unilateral intent to sell the policy to a third party with no insurable interest. Finally, we address our cases interpreting prior versions of that statute, and we conclude that none of that decisional law warrants a different reading of the current statute.

(a) The first point to square away is that the question whether a life-insurance policy is an illegal wagering contract is answered by applying our statutes that govern life-insurance policies. Although our legislature has deemed "[w]agering contracts" contrary to public policy and unenforceable as a general matter, OCGA § 13-8-2 (a) (4), the prohibition against wagering contracts in the context of life

6

insurance has been incorporated into a specific statutory requirement: the "insurable interest" rule. See OCGA § 33-24-3. Application of that rule, and not any broader foray into public policy untethered from this statute, must guide the analysis.

This conclusion follows from the history of insurance-based gambling and the law's response to it. Using life-insurance policies to "wager" on human lives is not a new practice. In the eighteenth century, it became popular in England to buy insurance on the lives of strangers—for example, elderly celebrities, or defendants being tried for capital crimes—as a form of gambling. See *PHL Variable Ins. Co. v. Bank of Utah*, 780 F3d 863, 867 (8th Cir. 2015), as corrected (Mar. 17, 2015) (noting the "popular [18th-century] English gambling activity" of "using insurance to bet on strangers' lives"); Peter Nash Swisher, *The Insurable Interest Requirement for Life Insurance: A Critical Reassessment*, 53 DRAKE L. REV. 447, 481 (2005). These policies were considered gambling bets, not insurance against any risk of loss, because those who bought this "insurance" had no interest in the underlying "asset," i.e., the life at stake. See,

7

e.g., *Conn. Mut. Life Ins. Co. v. Schaefer*, 94 U.S. 457, 460 (24 LEd 251) (1877) (defining "mere wager policies" as "policies in which the insured party has no interest whatever in the matter insured, but only an interest in its loss or destruction"). See also *Hardin v. NBC Universal, Inc.*, 283 Ga. 477, 479 (660 SE2d 374) (2008) (defining a "gambling or wagering contract" as "one in which the parties in effect stipulate that they shall gain or lose upon the happening of an . . . event in which they have no interest except that arising from the possibility of such gain or loss" (quoting *Martin v. Citizens' Bank of Marshallville*, 177 Ga. 871, 874 (171 SE 711) (1933))).

Disapproval of these human-life wagers goes back almost as far. Describing the practice of selling insurance on lives in which the insured had no interest as having "introduced a mischievous Kind of Gaming," the British Parliament passed a law in 1774 to "[r]emedy" the problem. Life Assurance Act, 1774, 14 Geo. 3, c. 48, Preamble, § 1 (Eng.). That remedy was straightforward: the law forbade anyone from taking out insurance on a life if the person "for whose Use, Benefit, or on whose Account such Policy or Policies shall

8

be made" had no "[i]nterest" in the life, and it declared "null and void" any policy that violated that rule. Id. at § 1.[3] Put simply, if someone wanted to take out insurance on another person's life, she had to have an interest of some sort in that life beyond the payout she would get at its end.

That rule is now known as the "insurable interest" rule, and it has become central to modern insurance, including life insurance in Georgia. See *Ga. Farm Bureaus Mut. Ins. Co. v. Franks*, 320 Ga. App. 131, 134 (1) (a) (739 SE2d 427) (2013) (citing *Woods v. Indep. Fire Ins. Co.*, 749 F2d 1493, 1496 (11th Cir. 1985)). See also J.

---

[3] The statute read in relevant part as follows:

Whereas it hath been found by Experience, that the making Insurances on Lives, or other Events, wherein the Assured shall have no Interest, hath introduced a mischievous Kind of Gaming: For Remedy whereof, be it enacted by the King's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, That from and after the passing of this Act, no Insurance shall be made by any Person or Persons, Bodies Politick or Corporate, on the Life or Lives of any Person or Persons . . . wherein the Person or Persons for whose Use, Benefit, or on whose Account such Policy or Policies shall be made, shall have no Interest, or by way of Gaming or Wagering; and that every Assurance made, contrary to the true Intent and Meaning hereof, shall be null and void, to all Intents and Purposes whatsoever.

Life Assurance Act, 1774, 14 Geo. 3, c. 48, Preamble, § 1 (Eng.)

9

STEPHEN BERRY, GEORGIA PROPERTY AND LIABILITY INSURANCE LAW § 3.1 (Aug. 2022 update). The general idea behind this rule is that a valid life-insurance policy needs some "reasonable ground . . . to expect some benefit or advantage from the continuance of the life of the assured," or else the contract is "a mere wager, by which the party taking the policy is directly interested in the early death of the assured." *Warnock v. Davis*, 104 U.S. 775, 779 (26 LEd 924) (1882). See also *Franks*, 320 Ga. App. at 134 (1) (a) ("Insurable interest is a keystone of the concept of insurance, safeguarding the insurer against the risk that arises if one who will receive the monetary benefit from loss of the insured property (or life, [in the case of life insurance]) has no interest in the property not being destroyed." (quoting *Woods*, 749 F2d at 1496)).

For our purposes, the key takeaway is that, in Georgia as elsewhere, "[t]he statutory requirement of insurable interest was intended to prevent wagering on human lives." *Wood v. N.Y. Life Ins. Co.*, 255 Ga. 300, 303 (336 SE2d 806) (1985) (citation omitted). See also *Equitable Life Assur. Co. of U. S. v. Paterson*, 41 Ga. 338,

10

363 (1870) ("The law prohibiting the insurance of a life by another, who has no interest in the continuance of that life, is founded in a sound public policy. It is intended to prevent gaming policies, and to avoid that inducement to crime which would exist if it were permitted." (citing Irvin's Code Rev. 1868 § 2776)). In other words, in the life-insurance context, our law generally relies on the insurable interest to distinguish between valid life-insurance policies and illegal wagering contracts. See *Paterson*, 41 Ga. at 363; *Hodge v. Ellis*, 76 Ga. 272, 277 (1886) (having an "insurable interest in the life . . . drew from that interest in the policy the sting of a wagering policy or an appearance of something like it"); *Natl. Life & Acc. Ins. Co. v. Hankerson*, 49 Ga. App. 350, 351 (175 SE 590) (1934) (rejecting argument that "no insurable interest in the plaintiff being shown, the policy was a wagering contract" because the beneficiary in question was a second cousin, which was enough to show an insurable interest). See also *Warnock*, 104 U.S. at 779 (describing an "insurable interest" as something that "take[s] the contract out of the class of wager policies"); *Schaefer*, 94 U.S. at 460 (describing an

11

insurable interest as "necessary, in order to take a policy out of the category of mere wager"). That means questions about whether a life-insurance policy is an illegal wagering contract, like those certified to us here, are addressed by turning to the relevant insurable-interest statute.

(b) In the context of life insurance, Georgia has had a statutory insurable-interest rule in one form or another dating back to the nineteenth century. See Code Ann. 1933 § 56-901; Code Ann. 1926 § 2496; Code Ann. 1910 § 2496; Code Ann. 1895 § 2114; Code Ann. 1882 § 2818; Irvin's Code 2d ed. 1873 § 2818; Irvin's Rev. Code 1868 § 2776; Irvin's Rev. Code 1867 § 2776; Code Ann. 1860 § 2768. The relevant statute in effect at the time the policy was taken out generally defines an insurable interest in a life as "an interest based upon a reasonable expectation of pecuniary advantage through the continued life . . . of another person and consequent loss by reason of such person's death . . . or a substantial interest engendered by love and affection in the case of individuals closely related by blood

12

or by law." OCGA § 33-24-3 (a) (1995).[4] Put more simply, a person has an insurable interest in the life of another if he can reasonably expect to be better off financially if the life continues, and worse off if it ends (or, in the case of close relations, if he has an interest in the life continuing based on love and affection). Further, "an individual has an unlimited insurable interest in his or her own life." Id. § 33-24-3 (b).

The statute also sets the rules about who must have insurable interests, and when. First, the rules about who: If a person takes out a policy on his own life, that person's "unlimited insurable interest" in his own life is enough; that person "may lawfully take out a policy of insurance on his own life . . . and have the policy made payable to whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest" too. Id. § 33-24-3 (b) (1995). On the other hand, if a life-insurance policy is "procured

---

[4] The current version of OCGA § 33-24-3 is materially the same in all respects relevant to the certified questions here. This statute covers all "personal insurance," but we train our attention here and throughout this opinion on the language specific to life insurance, which is included as a subset of personal insurance in this article of the Code.

13

or caused to be procured upon another individual," the person to whom "the benefits under the contract are payable" must have "an insurable interest in the individual insured," or the policy is "void." Id. § 33-24-3 (e) (1995).[5] Second, the rules about when: The insurable interest "must exist at the time the contract of [life] insurance becomes effective but need not exist at the time the loss occurs." Id. § 33-24-3 (d) (1995). And it follows from this timing rule that a life-insurance policy that meets the above insurable-interest rules at the time it becomes effective may be assigned later to someone without an insurable interest, subject to the policy's terms. See OCGA § 33-24-17.

(c) We can now turn to the certified questions. For reasons we

---

[5] In full, OCGA § 33-24-3 (e) (1995) (now OCGA § 33-24-3 (i)) says: Any personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured. In the case of a void contract, the insurer shall not be liable on the contract but shall be liable to repay to the person or persons who have paid the premiums all premium payments without interest.

14

will note below, we reframe the main question as follows: is a life-insurance policy an illegal wagering contract if the insured takes out the policy on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement in causing the policy to be procured? To answer this question, we look to the language of the insurable-interest statute in effect at the time the policy was issued and the context of that statute, which here includes statutory history and the decisional law interpreting prior versions of the statutory insurable-interest rule. See *Seals v. State*, 311 Ga. 739, 740 (1) (860 SE2d 419) (2021) ("The primary determinant of a text's meaning is its context, which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text." (citation and punctuation omitted)).

(i) We start with the text of OCGA § 33-24-3 (1995). As the Eleventh Circuit recognized, nothing in the language of that statute, which we just reviewed, prohibits a policy taken out by an insured

15

with the unilateral intent at that time to sell it to someone without an insurable interest. The statute is clear that a person "may lawfully take out a policy of insurance on his own life" because a person has an "unlimited insurable interest in his or her own life." Id. § 33-24-3 (b) (1995). Nothing in this language excludes from that broad approval a person who secretly "intends" to turn around and sell the policy to someone without an insurable interest. To the contrary, the statute allows a person taking out a policy on his own life to designate as a beneficiary "whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest," id., even though the person taking out such a policy would necessarily have an "intent" to designate that beneficiary at the time he or she took out the policy.

Nor does the language of the statute's prohibition against policies taken out on the life of *another* have anything to say about someone with the unilateral intent to sell a policy on their own life to a third party. Under OCGA § 33-24-3 (e) (1995), a life-insurance policy "procured or caused to be procured upon another individual is

16

void unless the benefits under the contract are payable to" someone with an insurable interest in the life. But if no third party was involved when the policy was taken out, the policy could not have been "procured or caused to be procured upon *another* individual." Id. (emphasis added).

(ii) Jackson does not even try to argue that the language of the insurable-interest statute applies. Instead, it relies on case law that predates the current insurable-interest statute. Jackson calls this case law "longstanding common law," and it says that this "common law" independently prohibits, as illegal wagering contracts, policies taken out by someone on his own life with the intent to sell them to a third party who has no insurable interest in the life.

Jackson is mistaken about the nature and import of this case law. The cases Jackson cites are not part of the body of common law from England that our General Assembly adopted in the late eighteenth century. See *Lathrop v. Deal*, 301 Ga. 408, 412 n.9 (II) (A) (801 SE2d 867) (2017) ("In 1784, our General Assembly adopted the statutes and common law of England as of May 14, 1776, except

17

to the extent that they were displaced by our own constitutional or statutory law. That adoption of English statutory and common law remains in force today." (citations omitted)). Instead, they are part of a body of decisional law that interprets and applies Georgia statutes dealing with insurable interests. See, e.g., *Chapman v. Lipscomb-Ellis Co.*, 194 Ga. 640, 643 (22 SE2d 393) (1942) (interpreting Code Ann. 1933 § 56-901 and § 56-903); *Ancient Ord. United Workers v. Brown*, 112 Ga. 545, 548–549 (37 SE 890) (1901) (citing *Union Fraternal League v. Walton*, 109 Ga. 1, 3 (34 SE 317) (1899), in interpreting Code Ann. 1895 § 2114 and § 2116); *Walton*, 109 Ga. at 3 (interpreting Code Ann. 1895 § 2114 and § 2116); *Exch. Bank v. Loh*, 104 Ga. 446, 466 (31 SE 459) (1898) (interpreting Code Ann. 1895 § 2114).

This distinction is significant in light of the statutory history of the insurable-interest rules for life insurance. From the late nineteenth century until 1960, two Georgia statutes touched on insurable interests for life insurance: one statute, which defined a contract of life insurance, imposed the basic insurable-interest rule

18

from the English common law. See Code Ann. 1895 § 2114 (defining a life-insurance contract as "a contract by which the insurer, for a stipulated sum, engages to pay a certain amount of money if another dies within the time limited by the policy," and explaining that "[t]he life may be *that of the assured, or of another in whose continuance the assured has an interest*" (emphasis added)); Code Ann. 1910 § 2496 (same); Code Ann. 1926 § 2496 (same); Code Ann. 1933 § 56-901 (same). Another said that a person who took out a policy on his own life could make it payable "to his personal representative, or to his widow, or to his children, or to his assignee." Code. Ann. 1895 § 2116. See Code Ann. 1910 § 2498 (same); Code Ann. 1926 § 2498 (same); Code Ann. 1933 § 56-903 (same). The language of these statutes remained materially the same over this period, and cases came to us that required us to apply and interpret that language. The resulting decisional law from our Court filled in the contours of these basic rules.

But then, in 1960, the statutes that this decisional law had interpreted and applied—and indeed all statutes addressing life

19

insurance—were "repealed in their entirety." Ga. L. 1960, pp. 754–764, § 2. In their place, the General Assembly passed a new and comprehensive Insurance Code "to revise, classify, consolidate, and supersede the present laws relating to insurance and to establish[] new laws relating thereto." Id. at p. 289. For the statutes dealing with insurable interests for life insurance, this was no mere consolidation or restyling effort. After repealing the old statutes, the General Assembly did not reenact the same or materially identical language from those statutes. Instead, it replaced the basic insurable-interest rules from the prior statutes with expanded rules that codified some of our Court's decisional law interpreting and applying those rules—much of which had been cited in annotations accompanying the old statutes. Compare, e.g., *Rylander v. Allen*, 125 Ga. 206, 209 (53 SE 1032) (1906) ("Beyond all controversy a man has an insurable interest in his own life, and we fail to see, when having that interest he enters into a contract with an insurer. . . why he who is most interested, whether actuated by ties of relationship, motives of friendship, gratitude, sympathy or love, may not make

20

the object of his consideration the recipient of his own bounty.");

*Turner v. Davidson*, 188 Ga. 736, 739 (4 SE2d 814) (1939) ("As a general rule, a reasonable expectation of pecuniary gain or advantage through the continued life of another person, and consequent loss by reason of his death, creates an insurable interest in the life of such person."); and *Wimbush v. Lyons*, 203 Ga. 273, 273 (1) (46 SE2d 138) (1948) ("A man has an unlimited insurable interest in his own life, and may ordinarily take out a policy of insurance upon his own life and make it payable to whomsoever he pleases, regardless of whether the beneficiary has an insurable interest in his life.") with OCGA § 33-24-3 (a) (1995) ("An insurable interest, with reference to personal insurance, is an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of another person and consequent loss by reason of such person's death or disability or a substantial interest engendered by love and affection in the case of individuals closely related by blood or by law."); id. § 33-24-3 (b) (1995) ("An individual has an unlimited insurable interest in his or

21

her own life, health, and bodily safety and may lawfully take out a policy of insurance on his own life, health, or bodily safety and have the policy made payable to whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest."). The result was the statutory framework for insurable interests that now appears at OCGA § 33-24-3.[6]

This statutory history tells us how to address the decisional law interpreting the old insurable-interest statutes. Because the General Assembly repealed those statutes and chose *not* to reenact materially similar language, we cannot read the new statutes as having incorporated the body of decisional law that interpreted the old statutory language, at least not wholesale. Cf. *Olevik v. State*, 302 Ga. 228, 236–237 (2) (c) (i) (806 SE2d 505) (2017) (in the context

---

[6] The version of OCGA § 33-24-3 that was in force in 1999 is materially the same, in all respects relevant to the questions here, as the version of that statute enacted as part of the Insurance Code of 1960. Compare Ga. L. 1960, pp. 657–658, § 56-2404, with OCGA § 33-24-3 (1995). The provisions of the current statute that define insurable interests in specific contexts, such as with respect to trustees, corporations, shareholders of corporations, non-corporation business associations, and charitable institutions, were added after 1999. See OCGA § 33-24-3 (c), (d), (f), (g), (j).

22

of constitutional interpretation, applying the prior-construction canon, which says that when language is enacted that had received an authoritative or definitive construction by a jurisdiction's court of last resort, that language is understood according to the prior construction (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322–326 (2012))). To the contrary, we must presume that the significant changes to this statutory language connote a change in meaning. See *Jones v. Peach Trader Inc.*, 302 Ga. 504, 514 (III) (807 SE2d 840) (2017) ("[C]hanges in statutory language generally indicate an intent to change the meaning of the statute." (citation and punctuation omitted)); SCALIA & GARNER 256–257 (explaining the reenactment canon, which provides that "a change in the language of a prior statute presumably connotes a change in meaning" where the changes are not merely "stylistic or nonsubstantive"). Further, we presume that the legislature enacted the new statute "with full knowledge of" the extant body of decisional law. *Dove v. Dove*, 285 Ga. 647, 649 (680 SE2d 839) (2009). So, in these particular circumstances—where the

23

General Assembly, in a comprehensive effort, stitched together a new statutory scheme using only pieces of the extant body of decisional law on the subject—the most reasonable inference is that the legislature accepted the rules of decisional law that it codified and rejected those rules it did not. See *Johns v. Suzuki Motor of America, Inc.*, 310 Ga. 159, 164 (3) (850 SE2d 59) (2020) ("There is no question that statutes can displace decisional law."); *Betts v. Brown*, 219 Ga. 782, 787 (136 SE2d 365) (1964) (declining to follow decisional law "entered into prior to the effective date of the Georgia Insurance Code" because "what was there held as to the insured's lack of interest in that contract and consequent inability to sue the insurer for breach thereof was not with the aid of the above mentioned Insurance Code provisions, which recognize the interest of the insured in the credit life insurance contract"). In short, if any of our body of decisional law interpreting the old statutes informs the meaning of the new Code, it is because a rule from particular decisional law was codified in the new Code.

(iii) So, we are back where we started: the language of OCGA

24

§ 33-24-3 (1995). We have already explained (and again, no one disputes) that the statute's language on its face does not contain the intent-based limitation that Jackson asks us to recognize—that is, that a policy taken out by someone on her own life with the intent to sell it to a third party who has no insurable interest in the life is void as an illegal wagering contract.

Moreover, a comparison of the decisional law on which Jackson relies with the statute confirms that this limitation, if it ever existed, did not survive the 1960 Insurance Code. That decisional law comprises a line of cases that dealt with questions about when someone could take out a policy on his own life and either assign it to or name as beneficiary someone without an insurable interest. The rule those cases settled on was, in short, that someone who procured insurance on his own life could assign the policy to another, who had no insurable interest in the life of the insured, "provided it be not done by way of cover for a wager policy." *Rylander*, 125 Ga. at 214–215 (citation omitted). See *Clements v. Terrell*, 167 Ga. 237, 243 (145 SE 78) (1928); *Quillian v. Johnson*, 122 Ga. 49, 56–57 (49 SE

25

801) (1905); *Walton*, 109 Ga. at 6; *Loh*, 104 Ga. at 465. The parties dispute how broad the "cover for a wager policy" proviso to this rule was. Crum says the cases prohibited only a kind of strawman scheme, in which the insured takes out the policy on his own life as a strawman for a third party who was the true beneficiary from the outset. See *Walton*, 109 Ga. at 4–5, 7 ("The true rule . . . is[] that one may insure his life and make the amount of the policy payable to whom he pleases, provided the contract is not made *at the expense and for the benefit of the person designated as the beneficiary*, as a cover for a mere wagering contract"; "a policy issued to one upon his own life, *if he be merely the agent of another* who is without interest, for whose benefit the insurance is thus taken, although upon the face of it it is payable to such person, is void"; "[b]ut if the insurance is *effected by some other person*, it is essential that he have a pecuniary interest in the life of the assured." (citations omitted; emphasis added)); *Rylander*, 125 Ga. at 211, 216–217 (explaining the "cover for a wager policy" proviso as preventing one from "do[ing] indirectly what the law prohibits him from doing directly"; because

26

it was "unlawful for a person to *effect insurance upon the life of another* in the continuance of whose life he has no interest, . . . the issue of a policy to one who has an insurable interest, and its immediate assignment, pursuant to a preconceived intent, to one without such interest, who undertakes to pay the premiums for his chance of profit upon his investment, is ineffective, and such an assignment is void" (emphasis added)). Jackson says the cases also prohibited taking out a policy on one's own life even with the *unilateral* intent to turn around and sell it to an as-yet-unidentified third party. See *Clements*, 167 Ga. at 243 ("A person may in *good faith* and without fraud, collusion, *or an intent to enter into a wagering contract*, lawfully take out a policy of insurance on his own life and make the same payable to whomsoever he pleases, either himself or his estate or a third person, regardless of whether or not the latter has an insurable interest." (quoting 37 C.J. 389, § 53b; emphasis added)). Crum's view is more firmly grounded in the decisional law than Jackson's, which places great weight on what appears to be dicta and language taken out of context. See *Crum*, 25

27

F4th at 860 (describing language in *Clements* as "dictum").

But we need not decide who is right. Whatever the breadth of the "no cover for a wager policy" proviso in that decisional law, the broader version that Jackson relies on finds no purchase in the language of the current statute. Indeed, the language of OCGA § 33-24-3 (b) (1995) looks a lot like the language of the rule as set out in Jackson's key case, *Clements*, 167 Ga. 237—but *without* the language Jackson says supports its version of the rule. Compare id. at 243 ("A person may *in good faith, and without fraud, collusion, or an intent to enter into a wagering contract*, lawfully take out a policy of insurance on his own life and make the same payable to whomsoever he pleases, either himself or his estate or a third person, regardless of whether or not the latter has an insurable interest; insured has an unlimited insurable interest in his own life which is sufficient to support the policy." (emphasis added; citation omitted)) with OCGA § 33-24-3 (b) (1995) ("An individual has an unlimited insurable interest in his or her own life, health, and bodily safety and may lawfully take out a policy of insurance on his own

28

life, health, or bodily safety and have the policy made payable to whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest.").[7] And the language of subsection (e) indicates that the new statute carried forward nothing more broad than the "strawman" version of the "cover for a wager policy" proviso, because that subsection necessarily implies the existence of a third party who has "procured or caused to be procured" a policy on "another individual." OCGA § 33-24-3 (e) (1995) (deeming "void" any life insurance contract "procured or *caused to be procured* upon another individual" if the benefits under the policy are not payable to the individual insured or someone with an insurable interest (emphasis added)).[8] See also

---

[7] In addition to relying on the decisional law's language about the insured's "intent," Jackson suggests that its intent-based restriction is implicit in the decisional law's references to "good faith." But OCGA § 33-24-3 (1995) does not carry forward any reference to "good faith." And the new Insurance Code also failed to carry forward earlier statutory language imposing on the insured a requirement that "[e]very application for insurance must be made in the utmost good faith." Ga. L. 1867, p. 530, § 2760. See Code Ann. 1933 § 56-820 (same); Code Ann. 1926 § 2479 (same); Code Ann. 1910 § 2479 (same); Code Ann. 1895 § 2097 (same).

[8] This provision, written in passive voice, does not distinguish between an intermediary—such as a viatical settlement broker—and a subsequent

29

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co.*, 28 A3d 1059, 1076 (II) (E) (Del. 2011) (interpreting a materially identical provision and concluding that the "relevant inquiry" was not "the insured's subjective intent for procuring a life insurance policy" but "who procured the policy and whether or not that person meets the insurable interest requirements"). In these circumstances—where the legislature repealed the old statutes that the body of decisional law had interpreted, codified some of that decisional law, and omitted from the new statutes any mention of the broader prohibition that Jackson seeks to rely on—we must reject the argument that Jackson's preferred rule survived the enactment of the 1960 Insurance Code. Cf. *Lathrop*, 301 Ga. at 440–441 (III) (C) (considering past decisional law addressing official immunity as "important context for a proper understanding" of constitutional amendment codifying official immunity where that

---

purchaser. Anyone who "caused" the policy to be procured on the life of another would be subject to OCGA § 33-24-3 (e) (1995). See *Crum*, 25 F4th at 863 n.11 (noting that our "answer concerning an intermediary" could be relevant to other issues in the federal court case).

30

provision "look[ed] a lot like that body of extant decisional law"); *Atlantic Specialty Ins. Co. v. City of College Park*, 313 Ga. 294, 300–301 (2) (869 SE2d 492) (2022) (explaining that a statutory amendment creating an automatic waiver of sovereign immunity up to a specified amount necessarily displaced prior law about waivers up to that specified amount, but did not displace decisional and statutory law for waivers above the specified amount).

3. *Conclusion*

For the reasons set out above, we answer the certified questions as follows: under Georgia law, a life-insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract.[9] In light of this answer, we need not

---

[9] We note that implicit in the Eleventh Circuit's first certified question as originally posed is the suggestion that a policy *would* be void as an illegal wagering contract if, at the time the policy was procured, a third party *was* "complicit in the procurement of the policy." *Crum*, 25 F4th at 863. Under the plain language of OCGA § 33-24-3 (e) (1995), that generally would be true if a third party has "caused" the insured to procure a policy on his own life and

31

answer the second certified question.

*Certified questions answered. All the Justices concur.*

---

name as beneficiary someone without an insurable interest. It is not as clear, however, whether a policy would be void if a third party "causes" an insured to procure a policy on his own life that names the insured himself as beneficiary, and the insured then turns around and immediately sells it to the third party or someone else without an insurable interest. Because neither the certified questions nor the parties' briefing directly address that separate and more difficult question, we do not answer it here.

32