NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 17, 2026

S25Q1073. WILMINGTON TRUST, NATIONAL ASSOCIATION v. AMERITAS LIFE INSURANCE CORP.

ELLINGTON, Justice.

Appellant Wilmington Trust brought this action against appellee Ameritas Life Insurance Company ("Ameritas") to collect death benefits payable under a life insurance policy issued by Ameritas's predecessor company. The policy insured the life of Jacqueline Leone in the amount of $6,000,000. In its complaint, Wilmington Trust alleged that Ameritas failed to pay the death benefit due under the policy and that the policy was valid and enforceable under Georgia law. In its answer, Ameritas alleged that the policy involved a stranger-originated life insurance ("STOLI") policy on the life of Leone and that Leone "was induced to lend her life to investors who procured or caused to be procured a ... wagering

policy on her life … in violation of Georgia's insurable interest laws and public policy."[1] Wilmington Trust and Ameritas filed cross-motions for summary judgment, but before ruling on those motions, the United States District Court for the Northern District of Georgia certified three questions to this Court regarding whether the life insurance policy was void under Georgia law as an illegal contract wagering on human life. We understand those questions to seek direction regarding the circumstances that may be considered by a court in determining when a third party has "procured or caused to be procured" a life insurance policy on the life of another person under OCGA § 33-24-3(i) (2006). As explained below, we conclude

---

[1] In a typical STOLI arrangement, instead of "investors purchas[ing] existing life insurance policies from insureds who no longer need the insurance to protect their families in the event of their deaths," "a life settlement broker persuades a senior citizen … to take out a life insurance policy, not for the purpose of protecting his or her family but for a current financial benefit." Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, & Securitization,* 13 U. Pa. J. Bus. L. 173, 187 (2010). See also *Estate of Malkin v. Wells Fargo Bank, N.A.*, 998 F3d 1186, 1193–94 (11th Cir. 2021) (discussing background of STOLI policies); *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 238 NJ 157, 169–72 (2019) (same).

that a third party can be said to have "procured or caused to be procured" a life insurance policy on the life of another, even if the insured played a role, if the third party is the one who effectively obtained or acquired the policy, and that courts should consider the totality of the circumstances when making this determination.

1. *Background*

For purposes of the parties' cross-motions for summary judgment, the federal district court recounted the factual history of the case as follows:

> *A. Factual Background*
> *i. Premium Financing Facility—The Peachtree Program*
>
> On October 16, 2006, Settlement Funding, LLC d/b/a Peachtree Settlement Funding ("Peachtree") and Barclays Bank PLC ("Barclays"), entered into a "Premium Finance Facility" and, as part of that Facility, a Loan Origination Agreement ("Origination Agreement"). Under the Origination Agreement, Peachtree was the "Originator" of life insurance policies and Barclays agreed to provide up to $50 million of premium financing to certain life insurance trusts that met the definition of "Eligible Borrower" for the payment of premiums (the "Peachtree Program"). The Origination Agreement also provided that Peachtree was responsible for originating life insurance policies at its own expense, including (i)

3

locating potential insureds through its agents, (ii) assisting the insured in the execution of the boilerplate documents under the Origination Agreement, (iii) generating at least two life expectancy reports on the insured and (iv) receiving policy illustrations from the insurer.

Under the Origination Agreement, Barclays agreed to provide up to $50 million in nonrecourse premium finance loans to newly created life insurance trusts. Peachtree was required to pay Barclays an "unused fee" each month, which was an amount equal to 0.5 percent of Barclays' $50 million commitment that was currently unutilized. As such, Peachtree was financially incentivized to originate policies in order to mitigate the "unused fee" pursuant to the Origination Agreement. The Origination Agreement also required that each policy and each loan used the same form transaction documents that could not be altered or amended.

The boilerplate trust agreement ("Form Trust Agreement") created a new Georgia trust in the insured's name, was nominally funded with $10, and contemplated the ownership of a future life insurance policy in the insured's name. Only Ken Shapiro and Michael Braun could serve as trustees of the new Georgia trusts under the Origination Agreement. According to the Form Trust Agreement, the intent of both the insured and trustee was that the insured never own or control the policy, and the insured disclaimed and relinquished all rights and powers in such policy which ensured that the insured could not jeopardize the investors' rights to the policy.

The Barclays' premium finance loans were for a term of twenty-four (24) months. The Barclays premium

finance loans made to the trusts were nonrecourse to the insured. The trust's assets were insufficient to pay off the balance of the loan. During the term of the loans, Peachtree also acted as the servicer of the loans and the policies under the Servicing Agreement. Under the terms of the Servicing Agreement, Peachtree was not separately compensated for servicing the policies or the loans. During the term of the loans, Peachtree, and not the trust, was required to make monthly interest payments to Barclays as a "Usage Fee" under the Origination Agreement. There were no cure periods in the Form Loan Agreement, and therefore the loans automatically went into default at maturity. After the loan matured, Peachtree was required to make a minimum bid for the full amount of principal and interest owed by the trusts. Even if Peachtree did not make that payment, Peachtree would acquire the rights to the policy within 60 days of the loan's default. Peachtree ultimately acquired all of the policies that were funded by Barclays under the Origination Agreement. The policies originated under the Origination Agreement were created as investment vehicles for the benefit of investors.

### ii. The Leones Apply for Life Insurance

In 2006, Chris Feery, an insurance agent, marketed the Peachtree Program, referenced above, as cost-free and risk free because all premiums would be paid by a third-party investor through a nonrecourse premium finance loan. Mr. Feery promised the insured parties free insurance for two years and the possibility of financial compensation in order to induce them to participate.

In 2006, Jacqueline Leone (the "Insured") and her husband, William A. Leone, were living in Miami, Florida.

5

At some point not borne out by the record, the Leones and Mr. Feery got into contact regarding the Peachtree Program. In the latter half of 2006, the Insured and her husband began the trial application process. In connection with the application for insurance, on September 29, 2006, the Insured underwent a medical examination in Miami, Florida. The Insured and her medical professional signed the Insurer-issued "Part II-Medical" portion of the life insurance application in Florida on September 29, 2006. The "Part II-Medical" insurance application form dated September 29, 2006 was a portion of the subject life insurance application that addresses a proposed insured's medical history, and was required by Insurer in order to issue the subject policy. The Insured's husband also applied for life insurance when the Insured did, but Ameritas determined that her husband was "uninsurable" in October 2006. In October and November 2006 and in accordance with its obligations as the Originator under the Origination Agreement, Peachtree requested and obtained two life expectancy reports on Mrs. Leone's life. Further, in connection with financial underwriting for the proposed policy, the Insured and her husband provided their financial information to Ameritas and underwent a telephone interview.

Bradley Gee and Mr. Feery were Insurer's insurance agents who ultimately sold the policy to the Leones. They worked with an insurance agency called "The Virtual Group," whose office was located in Pennsylvania. Mr. Gee was licensed and resided in Florida. Mr. Feery was licensed and resided in Florida and conducted his insurance business from Florida. On October 6, 2006, Union Central Life Insurance Company, a predecessor to Defendant Ameritas, received an informal request for a

6

$9 million policy on the Insured's life from Tim Gresge, a co-agent with Chris Feery. Following medical and financial underwriting for the subject policy, Ameritas issued a universal life insurance policy on February 1, 2007 for the Insured under policy number U000036824, in the face amount of $6,000,000 (the "Policy").

### iii. The Jacqueline Leone Irrevocable Trust

On November 28, 2006, the Jacqueline Leone Irrevocable Trust (the "Trust") was formed with a situs in Atlanta, as required by the Origination Agreement. The Trust Agreement was executed on Peachtree's Form Trust Agreement, which was required to be signed as-is. The trustee of the Trust was Ken Shapiro, one of the two "Eligible Trustees" under the Origination Agreement. Under the Origination Agreement and the Loan Agreement, Peachtree required that the beneficiary of the Trust be a family member or someone with insurable interest in the life of the insured. As such, the beneficiary of the Trust was the Insured's husband, William Leone. The Trust documentation indicated that Mrs. Leone was supposed to transfer $10 as the grantor per the Trust Agreement. In signing the Trust Agreement, Mrs. Leone expressly waived all rights and powers with respect to the trust. The Trust Agreement also explicitly stated that the intent of Mrs. Leone and Mr. Shapiro was that Mrs. Leone never own or possess the Policy, and that Mrs. Leone disclaimed her right to ever own or control the Policy.

On December 20, 2006, Mr. Shapiro and the Trust applied for a premium financing loan from Barclays. On January 4, 2007, Ameritas received a formal application for a $6 million dollar policy on Mrs. Leone's life whereby Mr. Shapiro, as trustee on behalf of the Trust, was the

policyowner and beneficiary. The Policy's application was signed in Atlanta, Georgia. On January 16, 2007, Ameritas received the Trust Agreement for the Trust with Mr. Shapiro as trustee. On January 19, 2006, Ameritas asked "[c]an you tell me what is the relationship of the trustee to the client" via an email that was forwarded to Chris Feery. Mr. Feery responded that Mr. Shapiro was Mrs. Leone and her husband's "accountant and trusted advisor." Mr. Shapiro testified that he had never met or spoken to Mrs. Leone and did not know anyone in the Leone family.

Consistent with Ameritas' STOLI prohibition and related requirements, Mr. Feery and Mrs. Leone executed a Statement of Policyowner and Agent Intent form, which Ameritas received on January 23, 2007. One Statement of Intent, executed by Mrs. Leone and Mr. Feery on January 19, 2007, denied that a loan would be used to pay the premiums and denied that the owner had spoken to an individual offering "free" or "no cost" insurance. But another Statement of Intent executed by Mrs. Leone on January 22, 2007, and Mr. Shapiro as the Trust's trustee on February 27, 2007, did indicate that a loan agreement with Barclays would be executed in connection with the transaction. On January 24, 2007, Ameritas approved the application. The next day, Ameritas sent a policy to the producer's office for delivery. The Leone Policy was issued as a Georgia policy on Georgia Policy Form UC 8706 GA, with an original issue date of February 1, 2007. On February 28, 2007, the Policy at issue in this litigation was reissued. In his statement and deposition, Mr. Shapiro confirmed that all Policy documents (including the application and delivery receipt, which confirms delivery of the Policy) were signed by him in Atlanta, Georgia.

8

*iv. The Nonrecourse Loan*

On February 16, 2007, the Insured and her husband executed a Disclosure Statement, Representations and Warranties, and Consent, in connection with a Loan and Security Agreement to pay for the Policy premiums with the assistance of attorney Ian Chaikin. Chaikin testified that he did not personally know Mrs. Leone, Mr. Leone, or anyone in the Leone family, until he was referred by Peachtree to act as the Leones' counsel.

On February 28, 2007, the Trust, as Borrower, entered into a Loan and Security Agreement with Barclays Bank PLC, as Lender in order "to borrow certain funds from Lender, which funds shall be used to pay the premium due ... for not less than the first two (2) years on the Policy" (the "Loan"). The Loan Agreement was executed on Peachtree's boilerplate Loan Agreement, which could not be altered or amended. In order to secure the Trust's repayment and performance obligations with respect to the Loan, the Trust granted a lien in favor of Barclays of all of the Trust's assets and collaterally assigned the Policy to Barclays' Collateral Agent. The principal amount of the Loan was $375,276.67. The initial premium payment was made on February 28, 2007. The Loan matured in two years.

Although there was an option for the Trust to extend the Loan for a third year, Mr. Shapiro testified that, under the Peachtree Program in which he was a designee, he did not recall a single occurrence where an insured reached into their own pocket and paid to extend the loan for a third year in the thirty to forty insurance trusts for which he served as a trustee. Mrs. Leone was not a

9

signatory to the Loan Agreement, and she was not responsible for paying any premiums. The Loan was nonrecourse as to Mrs. Leone and only recourse as to the Trust's nominal assets. But the Trust had no financial ability to repay the Loan, making the Loan nonrecourse. Moreover, the Trust could not have satisfied its obligations under the Loan without Barclays calculating the interest and fees due, because the interest due was dependent on the lender's calculation of LIBOR under the Loan Agreement, and the Loan could not contractually be partially prepaid. Neither Barclays nor Peachtree ever calculated the total amount due on the Loan, which would have included principal, interest, and an undisclosed amount of fees. Mr. Shapiro testified that the loans were never repaid by the trusts or the insured. There was no cure period under the terms of the Loan, and an event of default occurred automatically and immediately on the maturity date.

On February 28, 2007, the same day that the Loan Agreement was executed and the Policy issued, an Assignment of Life Insurance Policy as Collateral was executed whereby the Trust, as borrower and assignor, assigned all of its rights and interests in the Policy to Barclays, as lender and assignee ("Collateral Assignment"). Under the Collateral Assignment, Barclays had the "sole right" to collect the death benefits, surrender the Policy, further assign the Policy, and request that the insurer amend the Policy, since the first day that the Policy was issued. The only right Mrs. Leone maintained was that Mr. Leone could have potentially received a portion of the death benefits if Mrs. Leone passed away during the first two years. But as a condition for funding the Loan, Peachtree was required to obtain pre-issuance life expectancy reports on Mrs. Leone

indicating that she would survive at least 36 months but not more than 180 months. Peachtree calculated that there was a 98.7% chance that Ms. Leone would not die during the two-year Loan term. Mr. Shapiro further testified that he could not recall a single time that the beneficiary of a Peachtree trust received a policy's proceeds. Mrs. Leone's "Insured Designation of Contacts" form designated Ric Pertierra, a purported "Friend" of Mrs. Leone, as one of her contacts. However, Mr. Pertierra testified that he "did not personally know Ms. Leone, her husband, or anyone in the Leone family." Mr. Pertierra testified that he was a former colleague of Bradley Gee, Mrs. Leone's other designated contact. Mr. Pertierra further testified that his signature on the Designated Contact form was forged.

### v. Peachtree Acquires the Rights to the Policy

On February 27, 2009, two years after the Loan was issued and following the Loan's two-year contestability period, the Loan matured and automatically went into default. On March 2, 2009, New Age Capital ("New Age"), a Peachtree entity, purchased the rights to the Policy from Barclays and Barclays assigned its rights under the Loan Documents to New Age for $441,553.04, which were the principal and interest due on the loan. Barclays provided no representations or warranties regarding the validity of the Policy when it sold it to Peachtree, and Peachtree's pre-acquisition diligence was limited to obtaining additional life expectancy reports. There is no evidence to suggest that Mrs. Leone or her family received any compensation from the Peachtree assignment or subsequent sales of the Policy. Peachtree, as successor to Barclays under the Loan Agreement, did not communicate the amount due under the Loan to the

11

Trust, the intended borrower.

On March 26, 2009, the Trust received a notice of default from Peachtree Settlement Funding, as servicer for New Age (the "Notice"). The Notice did not calculate the principal, interest, default interest, or applicable fees under the Loan Agreement. Instead, the Notice demanded that the Trust acknowledge default and relinquish the Policy by signing a document called "Trust Acknowledgment of Default and Lender Rights." On May 19, 2009, the Trust signed the Trust Acknowledgment of Default and Lender Rights documents and relinquished the Policy to New Age.

Mrs. Leone died on November 23, 2022. Wilmington Trust, which had become the record owner of the policy, sought payment under the policy, but Ameritas declined to pay on the ground that the policy was stranger-originated life insurance that violated Georgia's insurable-interest law. In May and July 2023, Wilmington Trust filed a complaint and amended complaint, contending that the insurance policy was not invalid under Georgia law as an illegal wager on a human life and seeking, among other things, payment on the policy. Ameritas, on the other hand, contended that the life insurance contract was void because it violated Georgia's insurable interest laws in that investors wagered on Mrs. Leone's life by

procuring the policy or causing it to be procured on her life. Wilmington Trust and Ameritas subsequently filed cross-motions for summary judgment, after which the federal district court certified three questions to this Court:

> 1. Can a life insurance policy be void as an illegal wagering contract if, at the time the policy was procured, a third party was complicit in the procurement of the policy?
>
> 2. If the answer to the first question is "Yes," under what circumstances would a third party be considered "complicit" such that it "procured or caused to be procured" a personal insurance contract upon another individual?
>
> 3. Can a life insurance policy be deemed to constitute an unlawful wagering contract if the complicity of the third party does not rise to the level of "procured or caused to be procured?" If so, then the Court respectfully seeks further guidance as to the circumstances that determine when the "complicity" of the third party rises to the level of violating Georgia public policy prohibiting illegal human life wagering and when it does not.

2. *Analysis*

(a) *Georgia's Insurable-Interest Statute*

We have explained that "the question whether a life insurance policy is an illegal wagering contract is answered by applying our statutes that govern life insurance policies" and that "the

13

prohibition against wagering contracts in the context of life insurance has been incorporated into a specific statutory requirement: the 'insurable interest' rule. See OCGA § 33-24-3." *Crum v. Jackson Nat'l Life Ins. Co.*, 315 Ga. 67, 70 (2022) (providing overview of history of the insurable-interest requirement). This rule expresses "[t]he general idea … that a valid life insurance policy needs some reasonable ground ... to expect some benefit or advantage from the continuance of the life of the assured." In the absence of such a benefit or advantage, "the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured." Id. at 71 (quotation marks omitted). "[T]he key takeaway is that, in Georgia as elsewhere, the statutory requirement of insurable interest was intended to prevent wagering on human lives." Id. at 72 (punctuation and quotation marks omitted).

To determine whether a life insurance policy constitutes an illegal wagering contract, "we look to the language of the insurable-interest statute in effect at the time the policy was issued." *Crum*,

14

315 Ga. at 74. Here, OCGA § 33-24-3 (2006)[2] outlines several situations in which a person has an insurable interest. First, a person has an insurable interest in a life when he or she has "an interest based upon a reasonable expectation of pecuniary advantage through the continued life ... of another person and consequent loss by reason of such person's death ... or a substantial interest engendered by love and affection in the case of individuals closely related by blood or by law." OCGA § 33-24-3(a) (2006). Moreover, the statute provides that "[a]n individual has an unlimited insurable interest in his or her own life." OCGA § 33-24-3(b) (2006).

The statute also sets out rules that govern a person taking out a policy on his or her own life and a person taking out a policy on the life of another. Subsection (b) of § 33-24-3 (2006) concerns a person taking out insurance on his or her own life. Because "an individual

---

[2] The current version of OCGA § 33-24-3 is materially identical to the 2006 version of the statute. The statute applies to all "personal insurance," but the focus of the certified questions and thus of this opinion is on life insurance. See *Crum*, 315 Ga. at 73 n.4.

15

has an unlimited insurable interest in his or her own life," he or she "may lawfully take out a policy of insurance on his or her own life," and may "have the policy made payable to whomsoever such individual pleases, regardless of whether the beneficiary designated has an insurable interest." OCGA § 33-24-3(b) (2006). Subsection (i) of § 33-24-3 (2006) concerns procuring insurance on the life of another. It provides that a "[life] insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." OCGA § 33-24-3(i) (2006). As we explained in *Crum*, subsection (i) "necessarily implies the existence of a third party who has 'procured or caused to be procured' a policy on 'another individual.'" 315 Ga. at 80.[3]

---

[3] We note that in 2009, after the insurance policy was issued in this case, the General Assembly enacted a definition of "[s]tranger originated life insurance," as well as a provision making it fraudulent to engage in the creation of such insurance. See OCGA § 33-59-2(6)(A)(i)(X), (24). Because no

16

In *Crum*, we addressed certified questions from the United States Court of Appeals for the Eleventh Circuit regarding the 1995 version of our insurable-interest statute that is materially identical to the 2006 version applicable in this case. We concluded that, if no third party is involved when a policy is taken out, subsection (b) of the statute "broad[ly] approv[es]" the right of an insured to take out a policy on his or her own life with the "unilateral intent at that time to sell it to someone without an insurable interest." 315 Ga. at 74. We concluded that such a policy is not an illegal wagering contract. Id. at 80–81.

In *Crum*, we also noted that implicit in one of the Eleventh Circuit's certified questions was "the suggestion that a policy would be void as an illegal wagering contract if, at the time the policy was procured, a third party" procured the policy or caused it to be procured. Id. at 81 n.9. We explained that, "[u]nder the plain language of OCGA § 33-24-3(e) (1995)," which is materially identical

question has been certified regarding these provisions and because they were enacted after the insurance policy here was issued, we do not address the impact of these provisions on cases such as this one.

17

to OCGA § 33-24-3(i) (2006), "that generally would be true if a third party has 'caused' the insured to procure a policy on his own life and name as beneficiary someone without an insurable interest." *Crum*, 315 Ga. at 81 n.9. We added, however, that "if a third party 'causes' an insured to procure a policy on his own life that names the insured himself as beneficiary, and the insured then turns around and immediately sells it to the third party or someone else without an insurable interest," "[i]t is not as clear … whether a policy would be void." Id. This issue, which we did not have to decide in *Crum* "[b]ecause neither the certified question nor the parties' briefing directly addresse[d]" it, id., involved both parts of subsection (i)— whether a third party "procured or caused to be procured" a policy on the life of another and whether the policy named as a beneficiary someone without an insurable interest. Here, the district court's certified questions raise a similar issue, but we have been asked to only address the first part of it—how to determine whether a third party "procured or caused to be procured" a policy on the life of another.

(b) *The Certified Questions*

The first certified question asks whether a life insurance policy can be "void as an illegal wagering contract if, at the time the policy was procured, a third party was complicit in the procurement of the policy." Georgia's insurable-interest statute does not use the term "complicit." Instead, that statute makes clear that a policy "procured or caused to be procured" upon another person would be void "unless the benefits under the contract" are payable to someone with an insurable interest in that life at that time, which would include, among others, the person whose life is insured. In other words, if a policy on a person's life is "procured" by a third party (someone other than the person whose life is insured) or "caused to be procured" by that third party, it is void unless the benefits are payable to someone with an insurable interest in the life.

We now turn to the second certified question, which asks, "If the answer to the first question is 'Yes,' under what circumstances would a third party be considered 'complicit' such that it 'procured or caused to be procured' a personal insurance contract upon another

19

individual?" We reframe this question as follows, using the language of our statute: under what circumstances would a third party be considered to have "procured or caused to be procured" a personal insurance contract "upon another individual"? It appears that the federal district court and the parties are seeking guidance on how to determine when a life insurance policy is effectively "procured or caused to be procured" by the third party (in which case subsection (i)'s restrictions apply) or is instead procured by the insured person himself or herself (in which case, subsection (b) is the operative provision and allows the insured person to take out a policy and make whoever they want the beneficiary, regardless of whether the beneficiary has any insurable interest in the insured's life).

In determining the meaning of the phrase "procured or caused to be procured," we read "the relevant language in its most natural and reasonable way given the context in which it appears, including the surrounding statutory language, the statute's structure and history, and other law that makes up the legal backdrop against which the language was enacted." *Docs of CT, LLC v. Biotek Servs.,*

*LLC*, 321 Ga. 588, 591 (2025) (citation and quotation marks omitted). The context of our insurable-interest statute includes its "statutory history and the decisional law interpreting prior versions of the statutory insurable-interest rule." *Crum*, 315 Ga. at 74. Moreover, "[w]e often look to dictionaries from around the time the relevant legal text is enacted as a helpful starting point for understanding the meaning of that text," bearing in mind the caution that "dictionaries cannot be the definitive source of ordinary meaning in questions of textual interpretation because they are acontextual, and context is a critical determinant of meaning." Id. at 591 n.3 (quotation marks omitted). Accord *Wallace v. State*, 321 Ga. 505, 507 n.1 (2025) (explaining that "[i]n determining the 'ordinary meaning' of a word or phrase in a law, we can look to contemporaneous dictionaries from around the time when the text was adopted" (quotation marks omitted)).

We begin with the statutory text. Around the time that the "procured or caused to be procured" language first entered our insurable-interest statute in 1960, see Ga. L. 1960 (vol. 1) at 658,

the ordinary meaning of "procure" was "to get possession of: obtain, acquire; … esp. to get possession of by particular care or effort" and "to cause to ·happen or be done: bring about: effect … esp. to bring about by particular care or effort." Webster's Third New International Dictionary 1966. In addition, "cause" was defined as "to serve as cause or occasion of: to bring into existence." Id. And, in *Crum*, we said that subsection (i) "necessarily implies the existence of a third party who has 'procured or caused to be procured'" a life insurance policy on another person. 315 Ga. at 80. So, in context, to have "procured or caused to be procured" a life insurance contract "upon another individual" would mean that a third party has obtained, acquired, or gotten possession of a life insurance contract on the life of another or has "serve[d] as cause" for obtaining such a contract. See *Maslenjak v. United States*, 582 US 335, 341–42 (2017) (looking to materially identical dictionary definitions to conclude that the word "procure" in a statutory text meant "to obtain").[4]

---

[4] We note that OCGA § 33-24-3(i) (2006) is "written in the passive voice" and "does not distinguish between an intermediary—such as a … settlement

We next turn to the context in which these words appear. As noted above, part of the context of OCGA § 33-24-3(i) (2006) is its "statutory history and the decisional law interpreting prior versions of the statutory insurable-interest rule." *Crum*, 315 Ga. at 74. "From the late nineteenth century until 1960, two Georgia statutes touched on insurable interests for life insurance." Id. at 75. One of those statutes defined a life insurance contract as "a contract by which the insurer, for a stipulated sum, engages to pay a certain amount of money if another dies within the time limited by the policy," and explained that "[t]he life may be that of the assured, or of another in whose continuance the assured has an interest." Code Ann. 1895 § 2114. Other statutes until 1960 contained an identical provision. See Code Ann. 1910 § 2496; Code Ann. 1926 § 2496; Code Ann. 1933 § 56-901. The other statute

> said that a person who took out a policy on his own life could make it payable "to his personal representative, or to his widow, or to his children, or to his assignee." Code

broker—and a subsequent purchaser." *Crum*, 315 Ga. at 80 n.8. See *Dean v. United States*, 556 US 568, 572 (2009) (explaining that the use of the passive voice in statutory text "focuses on an event that occurs without respect to a specific actor").

Ann. 1895 § 2116. See Code Ann. 1910 § 2498 (same); Code Ann. 1926 § 2498 (same); Code Ann. 1933 § 56-903 (same).

*Crum*, 315 Ga. at 75.

In 1960, the General Assembly repealed all previous life insurance statutes and enacted a "new and comprehensive Insurance Code" that "was no mere consolidation or restyling effort"; "the General Assembly did not reenact the same or materially identical language from those statutes." Id. at 76. "The result was the statutory framework for insurable interests that now appears at OCGA § 33-24-3." *Crum*, 315 Ga. at 76–77.[5] Part of the context of OCGA § 33-24-3(i) (2006) is the decisional law interpreting the old insurable-interest statutes, and *Crum* laid the framework for evaluating how that body of decisional law informs the meaning of the new Insurance Code. There, we explained that "[b]ecause the General Assembly repealed those statutes and chose *not* to reenact materially similar language, we cannot read the new statutes as

---

[5] We note that subsection (i) of OCGA § 33-24-3 (2006) is materially identical to the version of the statute enacted as part of the Insurance Code of 1960. See Ga. L. 1960 (vol. 1) at 658.

24

having incorporated the body of decisional law that interpreted the old statutory language, at least not wholesale." *Crum*, 315 Ga. at 77. We concluded therefore that "if any of our body of decisional law interpreting the old statutes informs the meaning of the new Code, it is because a rule from particular decisional law was codified in the new Code." Id.

We look now to see if any of our pre-1960 decisional law informs the meaning of "procured or caused to be procured." In interpreting the meaning of the provision of our prior Codes that said that the life that is the subject of an insurance contract "may be that … of another in whose continuance the assured has an interest," we held that it precluded a third party from "insur[ing] the life of another, unless he has an insurable interest in the continuance of the life of that other." *Union Fraternal League v. Walton*, 109 Ga. 1, 3 (1899). This prohibition against insuring the life of another (unless there is the required insurable interest) clearly prohibits a person from *unilaterally* taking out a life insurance policy on another and thus precludes the quintessential "wager" on a human life that the

25

insurable-interest rules were designed to prevent. See *Crum*, 315 Ga. at 70–72. This decisional law is codified in OCGA § 33-24-3(i) (2006), which provides that any policy that a person procures or causes to be procured on the life of another is void (again, unless there is an insurable interest).

Moreover, some of our pre-1960 cases more broadly dealt with a third party's involvement with "insuring" the life of another. For example, in *Rylander v. Allen*, relying on the principle that "one cannot do indirectly what the law prohibits him from doing directly," we concluded that the rule that "it is unlawful for a person to effect insurance upon the life of another in the continuance of whose life he has no interest" could not be evaded "by the issue of a policy to one who has an insurable interest, and its immediate assignment, pursuant to a preconceived intent, to one without such interest, who undertakes to pay the premiums for his chance of profit upon his investment." 125 Ga. 206, 216–17 (1906). *Rylander* thus equated the "immediate assignment" of a policy by the insured to a third party, pursuant to a "preconceived intent," along with the payment of

26

premiums by the third party, with "effecting" insurance on the life of another and said that this type of assignment would be void as a "cover for a wager policy." Id. at 211, 216–217. The *Rylander* court did not purport to set out an exhaustive list of circumstances that might indicate third party involvement in obtaining a life insurance policy.

Similarly, in *Walton*, 109 Ga. 1 (1899), we explained that "a policy issued to one upon his own life, if he be merely the agent of another, who is without interest, for whose benefit the insurance is thus taken, although upon the face of it is payable to such person, is void" and that "one may insure his life, and make the amount of the policy payable to whom he pleases, provided the contract is not made at the expense and for the benefit of the person designated as the beneficiary, as a cover for a mere wagering contract." 109 Ga. at 7. *Walton*, like *Rylander*, equated certain circumstances—the insured being the agent of another and a third party paying for the contract—with a third party effecting insurance on the life of another. Again, however, the *Walton* court did not purport to say

27

that these circumstances were exhaustive and was not asked to analyze those circumstances in the case before it, as the policy there was not a "cover for a wager policy," because the insured obtained the policy on his own life, paid for it, and directed that it be paid to a third party based on his good will. Id. at 9.

Finally, in *Crum*, we described cases like *Rylander* and *Walton* as ones in which the insured acts as a "strawman" for a third party, *Crum*, 315 Ga. at 78-79, and suggested that, because OCGA § 33-24-3(e) (1995) "implies the existence of a third party who has 'procured or caused to be procured' a policy on the life of 'another individual,'" it carried forward the "'strawman' version of the 'cover for a wager policy' proviso" of *Walton* and *Rylander* into the 1960 Insurance Code. *Crum*, 315 Ga. at 78–80. We thus conclude that those cases inform the meaning of OCGA § 33-24-3(i) (2006). In *Crum*, however, we did not discuss what circumstances, from those cases or otherwise, would be relevant to determining when a third party "procured or caused to be procured" a life insurance contract on the life of another. *Crum*, 315 Ga. at 79–80.

Considering the ordinary usage of "procured or caused to be procured" and the relevant context, we conclude that the "procured or caused to be procured" language of OCGA § 33-24-3(i) (2006) means that a third party has effectively obtained or acquired a life insurance contract on the life of another or has "serve[d] as cause" for obtaining such a contract, when circumstances indicate that the insured is acting as an instrumentality for a third party.[6] In other words, the ultimate question is *who* obtained the policy. See *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex rel. Christiana Bank & Trust Co.*, 28 A3d 1059, 1076 (Del. 2011) (interpreting materially identical provision). Further, we conclude that a third party may be said to have procured or caused to be procured a life insurance contract on the life of another even if the person whose life is insured played some part in the transaction, if that insured is ultimately determined to be merely an agent or strawman for the

[6] We emphasize that the "'strawman' version of the 'cover for a wager policy' proviso," *Crum*, 315 Ga. at 80, under OCGA § 33-24-3(i) (2006) contains two parts—a third party procuring a life insurance policy on the life of another or causing a policy to be procured and the lack of an insurable interest—and that here we are only dealing with the first issue.

29

third party. In addressing this question, many circumstances could be relevant, including those discussed in *Walton* and *Rylander*, but before discussing those circumstances, we will address contentions by Wilmington Trust and Ameritas.

Wilmington Trust, relying primarily on *Burton v. John Hancock Mut. Ins. Co.*, 164 Ga. App. 592 (1982), argues that if an insured consents to a policy and participates in the application process, then the insured alone has procured the policy regardless of the role a third party may have played in the issuance of the policy. But the *Burton* court did not grapple with the meaning of the phrase "procured or caused to be procured," and when concluding that the insured procured the policy, it did not discuss how the role of a third party who was present at one of the meetings with the insurance agent factored into the evaluation of the procurement question. See id. at 593–96. In any event, we conclude that the rule proposed by Wilmington Trust is too narrow. Although the fact that an insured consents to a policy or participates to some extent in the application process is relevant to determining who "procured" the policy or

"caused" it "to be procured," it should not exclude from consideration steps that a third party has taken that could be said to have "caused" the policy "to be procured." In this regard, there is nothing in the statutory language that indicates that the person who procures a policy and the person who causes the policy to be procured must be the same person. In fact, there may well be multiple people who cause the procuring of a particular policy.

Ameritas also argues for a narrow position, contending that a court should look solely to who paid the premium in determining the procurement question and says that, if a third party pays the premium for the policy, then the policy is conclusively proven to be "procured or caused to be procured" by the third party. Ameritas argues that the language from *Walton* that "one may insure his life, and make the amount of the policy payable to whom he pleases, provided the contract is not made *at the expense"* of a third party demonstrates that the payment of the premium by a third party establishes by itself that the third party procured the contract or caused it to be procured. 109 Ga. at 7 (emphasis added). But *Walton*

31

did not purport to set out an exhaustive list of circumstances to consider in determining who procured a life insurance policy, see 109 Ga. at 7, and although we agree that who pays the premium is a relevant circumstance in determining who procured a policy or caused it to be procured, we conclude that considering just this one circumstance is not consistent with the ordinary understanding of "procured or caused to be procured."[7] Ameritas's proposed rule might mean that a person who otherwise completes every step of the process of obtaining a life insurance policy on his or her own life but borrows the premium from a friend, with the intent to pay it back immediately, could fall within the ambit of OCGA § 33-24-3(i) (2006).

For the foregoing reasons, courts evaluating whether a third party has procured or caused to be procured a life insurance contract on the life of another must consider the totality of the circumstances.

---

[7] Ameritas also relies on a Delaware case to argue that a court should look solely to who paid the premium in determining who procured a policy, see *Price Dawe*, 28 A3d at 1076, but to the extent that *Price Dawe* stands for this proposition, we decline to follow it for the reasons given above.

Various circumstances could be relevant to this inquiry, including who paid the premiums on the policy; who located the potential insured; who participated in the formation of the policy; who prepared and controlled the content of the relevant documents; whether the policy was created for the benefit of the insured or investors; who had the power to name the trustee of a life insurance trust if one was created and who had control over the trust; the sophistication of the insured on financial matters; and the extent of the insured's participation in the insurance application process. See, e.g., *Rylander*, 125 Ga. at 217 (looking to who paid the insurance premiums to determine who procured a life insurance policy); *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 44 F4th 1024, 1035 (7th Cir. 2022) (concluding that an insured was merely an instrument for third party investors based on, among other things, the facts that the insured's policy was part of a broader program to secure life insurance policies for investors, that an advocate for that program informed the insured about the program and helped him apply for an insurance policy, and that the insured

33

could not afford the policy himself); *Sun Life Assurance Co. of Canada v. Bank of Utah*, No. 1:21-cv-03973-LMM, slip op. at 9–10 (N.D. Ga. Nov. 6, 2023) (concluding that a variety of factors were relevant to the determination of who procured a life insurance policy, including the fact that the 75-year-old insured had decades of experience in financial matters; that he was still working in those areas when the policy was taken out; that he submitted to a credit check and provided relevant financial and medical information; and that there was some evidence that the insured and not the lender ultimately sold the policy for a profit); *CMFG Life Ins. Co. v. Nance*, No. 24-cv-01034-ABA, slip op. at 9 (D. Md. Jan. 7, 2026) (holding that a third party caused a life insurance policy to be procured where she filled out the application, where she testified that it was her and the insured's intent for her to manage the policy, where she communicated with the insurance company about the policy and payment details, and where she paid the majority of the premiums). We note that "[t]he ultimate inquiry cannot be reduced to a multi-factor test," *WS CE Resort Owner, LLC v. Holland*, 315 Ga. 691, 706

(2023), and we do not assign any particular weight to the various potential circumstances. Instead, a court must consider the totality of the circumstances and determine, in light of those circumstances, whether the policy was effectively obtained by insured himself or by a third party.

Accordingly, we answer the second certified question as follows: under Georgia law, a third party can be said to have "procured or caused to be procured" a life insurance policy on the life of another, even if the insured played a role, if the third party is the one who effectively obtained or acquired the policy. To determine whether that is so, a court should consider the totality of the relevant circumstances, including those outlined above.[8]

If a court concludes that, under that inquiry, a third party "procured or caused to be procured" the policy on the life of another, the policy is an illegal wager unless it determines that, "at the time when the contract was made," "the benefits under the contract are

---

[8] We conclude that our answers to the first two certified questions make it unnecessary to answer the third one.

payable to the individual insured or such individual's personal representative or to a person having ... an insurable interest in the individual insured." OCGA § 33-24-3(i) (2006). The district court did not certify a question about this provision and so we do not undertake to construe this requirement.

*Certified Questions Answered. All the Justices concur.*